**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

UNITED STATES OF AMERICA,

               **Plaintiff,**

v.                                    **Case 2:13-cr-20054-SHM**

MARC ANTHONY BAECHTLE,

               **Defendant.**

## REPORT AND RECOMMENDATION ON DEFENDANT'S MOTION TO SUPPRESS EVIDENCE

Before the Court is Defendant, Marc Anthony Baechtle's, Motion to Suppress Evidence. (D.E. #22). The instant motion has been referred to the United States Magistrate Judge for Report and Recommendation. (D.E. #23). For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress be DENIED.

## I. Introduction

On February 20, 2003, a grand jury empaneled in the Western District of Tennessee issued a two-count Indictment against Defendant charging him with violating 18 U.S.C. § 2251(a) and §2. Defendant entered a plea of not guilty. On January 16, 2015, Defendant filed the instant Motion to Suppress Evidence requesting that the Court "suppress all evidence written, oral, or tangible, obtained during or as a direct or indirect result from the search of the Marc Baechtle residence located at 12936 Waterford Wood Circle, Apt. 305, Orlando, Florida, on or about September 25, 2007." On January 28, 2015, the United States filed its Response thereto.

1

## II.  Proposed Findings of Fact

On September 25, 2007, Judge Wilfredo Martinez of the Circuit Court of the Ninth Judicial Circuit in and for Orange County, Florida issued a Search Warrant for the premises occupied by or under the control of Defendant at the address of 12936 Waterford Wood Circle #305, Orlando, Florida.  (Def.'s Mot. to Suppress, Exh. 1 at 1, 3).  The Search Warrant determined that there was probable cause to conduct a search for evidence, including but not limited to, "[i]mages of child pornography and files containing images of child pornography in any form wherever it may be stored or found, including . . . [a]ny computer, computer system and related peripherals," "movies, photographs, and other evidence of the felony sexual battery incidents between Mark Baechtle and the victim [M.D.]," and "motion pictures, films, videos, and other recording of visual depictions of children engaged in sexually explicit conduct."  (*Id.* at 1-2).  The Search Warrant set forth that the evidence sought is in violation of Florida state law, which criminalizes sexual battery and possession of child pornography.[1]

The Affidavit for Search Warrant ("Affidavit") submitted to Judge Martinez was sworn to by Special Agent Ryan W. Bliss of the Florida Department of Law Enforcement ("FDLE").[2]  (*Id.*

---

[1]  The relevant provisions of Florida law set forth in the Search Warrant are Florida Statutes § 794.011(8)(b) (sexual battery) and § 827.071(f) (possession of child pornography).

[2]  The Affidavit was apparently originally dated September 27, 2007, which was after the date on which the Search Warrant was issued and executed.  Defendant states that Judge Martinez "later drafted an affidavit stating that the September 27 date was a clerical error and that he was presented with the affidavit of Agent Bliss on September 25."  (Mot. to Suppress at 3 ¶ 6).  While Judge Martinez's affidavit is not in the record before this Court, the parties do not dispute that the incorrect date was a clerical error, and neither party raises any issue regarding this error.  (Mot. to Suppress at 3 ¶ 6; Resp. to Mot. to Suppress at 6-7).  Further, as the United States notes, a clerical error such as an incorrect date does not render a warrant to be in violation of the Fourth Amendment.  *United States v. Boyd*, No. 92-5412, 1993 WL 127941, at *1-*2 (6th Cir. Apr. 22, 1993) (per curiam).

at 4).  The Affidavit sets forth Special Agent Bliss's twelve-year employment history with FDLE, his law enforcement experience, including in the areas of violent crime and sex crime, and his training, including on computer crimes and child sexual exploitation.  (*Id.* at 5).  The Affidavit further sets forth, based upon Special Agent Bliss's knowledge, training, and experience, as well as the training and experience of others in law enforcement with whom he has had discussions, that "[c]omputers and computer technology have revolutionized the way in which child pornography is produced, distributed and utilized," that the "development of computers has also revolutionized the way in which child pornography collectors interact with and sexually exploit[] children," and that there are "certain characteristics common to individuals involved in the receipt and collection of child pornography."  (*Id.* at 5-7).

As to the revolutionary changes in investigating crimes of child pornography and sexual exploitation of children, Special Agent Bliss stated that the development of computers has made it easier and less costly to produce, store, and distribute child pornography and to do so with relative anonymity.  (*Id.* at 5-6).  Special Agent Bliss additionally set forth the four basic functions computers serve in connection with child pornography: "production, communication, distribution, and storage."  (*Id.* at 6).

With respect to production, the development of digital cameras and scanners allows child pornographers to easily upload recordings "directly to the computer" in a method that "does not leave as large a trial for . . . law enforcement to follow."  (*Id.*)  With respect to communication and distribution, computers have allowed child pornographers to electronically connect "to literally millions of computers around the world" in ways that permit "quick, relatively secure" and anonymous international communication that is "as easy as calling next door."  (*Id.*) These methods

of production, communication, and distribution "are well known and are the foundation of transactions between child pornography collectors over the Internet." (*Id*. at 6-7)

With respect to storage, Special Agent Bliss stated that a "computer's capability to store images in digital form makes it an ideal repository for child pornography," especially due to the growth in storage capacity of home computers. (*Id*. at 7). While the computer can store "thousands of images at very high resolution," it leaves behind "no readily available evidence" of the illegal activities absent a "careful laboratory examination of [the] electronic storage devices." (*Id*.)

As to the characteristics common to individuals involved in the receipt and collection of child pornography, Special Agent Bliss stated that "[c]hild pornography collectors may receive sexual gratification, stimulation, and satisfaction from contact with children; or from fantasies, they may have, viewing children engaged in sexual activity or in sexually suggestive poses, such as in person, in photographs, or other visual media; or from literature describing such activity." (*Id*.) Individuals engaged in crimes of child pornography often "collect sexually explicit or suggestive materials, in a variety of media" and use these materials "for their own sexual arousal and gratification" as well as "to lower the inhibitions of children they are attempting to seduce, to arouse selected child partners, or demonstrate the desired sexual acts." (*Id*.)

"Collectors of child pornography almost always possess and maintain their 'hard copies' of child pornographic material, that is, their pictures, films, video tapes, magazines, negatives, photographs, correspondence, mailing lists, books, tape recordings, etc. in the privacy and security of their home or some other secure location." (*Id*.) Child pornographers "typically retain" this material "for many years" and often keep their collections "in a digital or electronic format" on a home computer. (*Id*. at 7-8) "These collections are often . . . kept close by, usually at the collector's

residence to enable the collector to view the collection, which is valued highly." (*Id*. at 8). "Child pornography collectors may correspond with and/or meet others to share information and materials," they "rarely destroy correspondence from other child pornography distributors/collectors," and they typically "conceal such correspondence as they do their sexually explicit material." (*Id*.) Law enforcement officers involved in the investigation of child pornography throughout the world also document that "[c]ollectors of child pornography prefer not to be without their child pornography for any prolonged time period." (*Id*.)

After setting forth his knowledge, experience, and training, Special Agent Bliss addressed the "facts tending to establish probable cause for this application." (*Id*.) On September 19, 2007, Special Agent Bliss interviewed the victim, M.D, who advised him of the following.[3] (*Id*.) Beginning in the late spring of 2001, while living in Memphis, Tennessee, Defendant began sexually molesting M.D. (*Id*.) M.D. was eleven years old when the sexual molestation began, and Defendant was her mother, Michelle Dobbs', boyfriend. (*Id*.) M.D. stated that, when she would return home from school, Defendant would have images of child pornography displayed on the computer. (*Id*.) Defendant would "coerce" her to view certain images of child pornography known as "the Jordache" and would describe acts taking place between the adult male and the minor female of approximately the same age as M.D. (*Id*.) Defendant would also sexually molest her while viewing the child pornography on the computer. (*Id*.) This type of activity occurred for approximately three months. (*Id*.)

By June, 2001, prior to M.D.'s twelfth birthday in July, Defendant's "demands for sex from

---

[3] The victim's name has been redacted from the Search Warrant. Other portions of the record in this case refer to her by name or her initials. As the alleged offenses occurred when she was a minor, the Court will refer to her by her initials, M.D.

[M.D.] continued." (*Id.*) During the summer months, Defendant would watch child pornography on the computer and engage in sexually explicit conduct with M.D. (*Id.*) The nature of the sexual conduct during these months "quickly progressed" despite M.D.'s resistence due to the intense pain she experienced from engaging in the sexually explicit conduct. (*Id.* at 9)

On one occasion, Defendant traveled to South Carolina with M.D. (*Id.*) While traveling to South Carolina in Defendant's van, Defendant repeatedly forced M.D. to engage in sexually explicit conduct. (*Id.*) When M.D. refused to engage in certain sexual acts, Defendant advised that she should take a sleeping pill so that she "would not know" it was occurring. (*Id.*) Defendant produced a "small white colored pill and advised that this pill would cause [M.D.] to sleep and [M.D.] would not feel any pain." (*Id.*) M.D. took the pill and "did not awaken until the late afternoon of the next day." (*Id.*) Upon awakening, M.D. asked Defendant if his requested sexual acts had occurred. (*Id.*) He responded that they had not but "directed" her to his digital camera that contained nude photographs of her captured while she was sleeping. (*Id.*) Defendant informed M.D. that he had removed her clothes while she was asleep and "placed [her] in different sexual positions for the photographs." (*Id.*) M.D. advised Special Agent Bliss that Defendant "always used the digital camera to take photographs so that the photographs could then be downloaded on to [sic] the computer." (*Id.*)

In April, 2005, M.D. and her mother moved to Melbourne, Florida without Defendant. (*Id.*) Approximately two months later, Defendant traveled to Melbourne and moved into their house. (*Id.*) Once Defendant was again residing with M.D. and her mother, Defendant continued to engage in sexually explicit conduct with M.D.; however, he no longer forced M.D. to watch the child pornography even though the computer was still in his possession. (*Id.*) In June, 2005, Defendant

"moved out of the home and returned to South Carolina to be near family[,] taking the computer equipment during the move." (*Id*.)

In November, 2005, Defendant moved back to the Melbourne residence of M.D. and her mother and "was still in possession of the computer equipment." (*Id*.) In February, 2006, M.D., her mother, and Defendant moved to Satellite Beach, Florida. (*Id*.) According to M.D., Defendant "prepared the same computer in a back room at the house." (*Id*.) M.D. "found still photographs of other women in different sexual positions" on the computer, including sexual photographs of her mother and Defendant. (*Id*.) At this address, Defendant committed sexual battery upon M.D. "approximately 60 more times." (*Id*.)

In April, 2006, M.D.'s mother told Defendant to "leave the residence." (*Id*.) "The first items that [Defendant] removed from the residence were the two computer hard drive towers that contain the pornographic images." (*Id*.) Michelle Dobbs stated "that the hard drive towers [Defendant] removed from the residence are the same hard drive towers that [Defendant] maintained in Tennessee while [Defendant] and Dobbs cohabitated at the same residence." (*Id*. at 9-10)

After his interview with M.D., Special Agent Bliss also interviewed Michelle Dobbs and learned that Defendant continues to maintain the same electronic mail address that he had while living in Tennessee "when the first molestations began with the use of pornographic images being displayed on his computer." (*Id*. at 10) Michelle Dobbs also confirmed that she had communicated with Defendant by instant message conversations as recently as September 17, 2007. (*Id*.)

On September 24, 2007, members of FDLE and the Seminole County Sheriff's Office arrested Defendant pursuant to a Brevard County warrant for Sexual Battery that had been issued as a result of Defendant's sexual activity with M.D. (*Id*.) Pursuant to his arrest and waiver of his

constitutional rights, Defendant "confessed to the sexual activity with [M.D.,] who according to [Defendant] was approximately 14 years of age when the sexual activity occurred." (*Id*.) Specifically, Defendant confessed to sexual activity with M.D. while residing in Tennessee, visiting South Carolina, and subsequently residing in Florida. (*Id*.)

On the same date, FDLE Resident Agent in Charge Robert Wayne Ivey ("RAC Ivey") interviewed Defendant's current girlfriend, Oanh Van Thai. (*Id*.) Thai apprised RAC Ivey that Defendant possessed two computers at his apartment located at 12936 Waterford Wood Circle, Apartment 305, Orlando, Florida in the Waterford Point Apartments. (*Id*.) "One of the computers was a Toshiba Laptop that was inoperable and had been provided to [Defendant] for the purpose of repair." (*Id*.) "The second computer was an older 'Tower' styled computer that [Defendant] had possessed for a long time." (*Id*.) According to Thai, the "'Tower' styled computer was in [Defendant's] possession when [Defendant] lived with Michelle Dobbs in Satellite Beach, Florida and then moved in with Thai and then later moved to the Waterford Point Apartments." (*Id*.) Thai advised that, when Defendant "moved out of the residence with Dobbs[,] the only thing he cared about taking was his computer." (*Id*.) Special Agent Bliss remarked that Thai's statement was "consistent with the statement of the victim who reported the computer as being the only item [Defendant] removed from the house at the time of separation." (*Id*.) Thai stated that Defendant "maintained custody and control of the computer that is now located at the Waterford Point Apartments." (*Id*.)

Special Agent Bliss described the following items believed to be kept in or on the premises at the 12936 Waterford Wood Circle address in violation of Florida law:

> Images of child pornography labeled as "the Jordache" that has been widely distributed on child pornography web sites, images of the sexual battery perpetrated

8

against the minor victim, [and] images of child pornography and files containing images of child pornography in any form wherever it may be stored or found . . . .

(*Id*. at 4-5).

The Search Warrant was executed on September 25, 2007 by Special Agent Bliss who filed a FDLE Receipt Form listing the property seized. (*Id*. at 13-17). Although the precise nature of the evidence obtained as to the indicted offenses is not entirely clear from the FDLE Receipt Form, Defendant states that the United States has advised that it intends to "use one VHS video" as evidence in this case. (Mot. to Suppress at 3 ¶ 7).

## III. Proposed Conclusions of Law

The Fourth Amendment provides, in pertinent part, that "no Warrants shall issue, but upon probable cause." U.S. Const. amend. IV. "Probable cause exists when there is a fair probability, given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *United States v. Johnson*, 351 F.3d 254, 258 (6th Cir. 2003) (citing *United States v. Greene*, 250 F.3d 471, 479 (6th Cir. 2001)) (internal quotations omitted). "Probable cause is defined as a reasonable grounds for belief, supported by less than prima facie proof but more than mere suspicion." *Johnson*, 351 F.3d at 258 (citing *United States v. Bennett*, 905 F.2d 931, 934 (6th Cir. 1990)). "When making a probable cause determination, a court is limited to the four corners of the affidavit." *United States v. Rose*, 714 F.3d 362, 366 (6th Cir. 2013) (citing *United States v. Allen*, 211 F.3d 970, 973 (6th Cir. 2000)).

When presented with an application for a search warrant, "[t]he task of the issuing magistrate is simply to make a practical, common-sense decision whether, given all the circumstances set forth in the affidavit before him, including the veracity and basis of knowledge of persons supplying hearsay information, there is a fair probability that contraband or evidence of a crime will be found

at a particular place." *Illinois v. Gates*, 462 U.S. 213, 238 (1983) (internal quotations omitted).

The totality of the circumstances considered for the probable cause determination includes whether there is a "nexus between the place to be searched and the evidence sought." *Rose*, 714 F.3d at 366 (citing *United States v. Brooks*, 594 F.3d 488, 492 (6th Cir. 2010)). "In order to establish a sufficient nexus, there must be reasonable cause to believe that the items sought are located on the property to which the affiant seeks entry." *Rose*, 714 F.3d at 366. A determination of probable cause also requires a consideration of whether the information contained in the affidavit is stale, as "stale information cannot be used." *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010); *United States v. Frechette*, 583 F.3d 374, 377 (6th Cir. 2009). The staleness inquiry depends on the following four factors: (1) the character of the crime; (2) the criminal; (3) the thing to be seized; and (4) the place to be searched. *Frechette*, 583 F.3d at 378 (quoting *United States v. Abboud*, 438 F.3d 554, 572-73 (6th Cir. 2006)).

When the probable cause determination of the issuing magistrate is challenged, "[t]he standard of review for the sufficiency of an affidavit is whether the magistrate had a substantial basis for finding that the affidavit established probable cause to believe that the evidence would be found at the place cited." *Johnson*, 351 F.3d at 258 (citing *Greene*, 250 F.3d at 478); *see also Gates*, 462 U.S. at 238-39. "A magistrate's determination of probable cause is afforded great deference by the reviewing court and should only be reversed if arbitrarily made." *Id.* (internal quotations omitted). "Review of an affidavit and search warrant should rely on a totality of the circumstances determination, rather than a line-by-line scrutiny." *Johnson*, 351 F.3d at 258 (citing *Greene*, 250 F.3d at 479) (internal citations and alterations omitted). "Courts should review the sufficiency of the affidavit in a commonsense, rather than hypertechnical manner." *Id.*

## A. *Request for Evidentiary Hearing*

Upon review, the Court begins by considering the threshold question of whether an evidentiary hearing is necessary on Defendant's Motion to Suppress Evidence, as Defendant has requested that such a hearing be held. Defendant's two challenges to the issuing magistrate's probable cause determination are (1) whether the Affidavit established a nexus between the evidence sought and the place to be searched, and (2) whether the information contained in the Affidavit was stale. These are both challenges as to whether the issuing magistrate had a substantial basis for finding that the Affidavit established probable cause. As set forth above, the issuing magistrate was confined by the four corners of the Affidavit, as is this Court in its review of the probable cause determination. This Court's analysis of Defendant's challenge to whether the appropriate nexus exists and whether the evidence was stale is based upon the information contained within the four corners of the Affidavit.

It is well-settled that an evidentiary hearing is not appropriate when a challenge to the probable cause contained within an affidavit is raised. *See United States v. Dyer*, 580 F.3d 386, 390 (6th Cir. 2009) ("In reviewing the sufficiency of the evidence supporting probable cause, we are limited to examining the information contained within the four corners of the affidavit"); *United States v. Frazier*, 423 F.3d 526, 531 (6th Cir. 2005) (stating that the "review of the sufficiency of the evidence supporting probable cause is limited to the information presented in the four-corners of the affidavit"); *United States v. Allen*, 211 F.3d 970, 975 (6th Cir. 2000) (stating than an affidavit must be judged "on the adequacy of what it does contain, not on what it lacks, or on what a critic might say should have been added"); *United States v. Allen Burney*, 1:14-cr-99, 2015 WL 418233, at *6 (E.D.Tenn. Feb. 2, 2015) (stating that the defendant is not entitled to an evidentiary hearing

because the court "must make a determination of probable cause by evaluating the information contained within the four corners of the affidavit supporting the warrant"); *United States v. Ricky Brown*, No. 11-20281, 2012 WL 32713, at *4 (E.D. Mich. Jan. 6, 2012) (denying a request for evidentiary hearing because "only the four-corners of the affidavit can be reviewed in a motion to suppress a search warrant for lack of probable cause"); *United States v. Frank M. Murrell*, No. 3:10cr14, 2011 WL 13743, at *1 (Jan. 4, 2011) (finding that an evidentiary hearing is unnecessary because, in reviewing the sufficiency of the evidence supporting probable cause, the court is limited to the information contained within the four corners of the affidavit); *United States v. Corley*, No. 10-20036, 2010 WL 3259719, at *2 n.2 (E.D.Mich. June 22, 2010) ("Because this motion must be determined based on the four corners of the affidavit, the Defendant is not entitled to an evidentiary hearing."). Accordingly, it is recommended that Defendant's request for an evidentiary hearing be DENIED.[4]

### B. Nexus Between Evidence Sought and Place to be Searched

Next, the Court must address whether the Affidavit established a nexus between the evidence sought and the place to be searched. Defendant argues that, "while this Circuit has repeatedly held that possession of child pornography is not a fleeting crime and that evidence can generally be derived from digital media months after the material is presumably deleted, it does not excuse the failure of this affidavit to provide a nexus between alleged criminal activity in Tennessee in 2001

---

[4] Defendant's request for an evidentiary hearing and "findings" was made pursuant to *United States v. Moore*, 936 F.2d 287 (6th Cir. 1991). Defendant relies on the *Moore* court's statement that "[e]ssential findings on the record are necessary to facilitate appellate review." *Id.* at 289. However, this request for findings on the record does not entitle Defendant to an evidentiary hearing when challenging the probable cause contained within the four corners of a search warrant affidavit, as the District Court's Order on the instant motion will contain all essential findings necessary for appellate review.

and South Carolina at some unknown time with the place to be searched on September 25, 2007." (Mot. to Suppress at 4-5).[5] The Government concedes that the Affidavit must establish the requisite nexus but argues that the evidence contained therein adequately does so.

The consideration of the nexus requires a review of the facts set forth in the Affidavit. As set forth above, the sexual abuse of M.D. began in 2001 in Memphis, Tennessee. Defendant would display images of child pornography on his computer in M.D.'s home, would "coerce" her to view images of child pornography on his computer, would describe acts taking place between the adult male and the minor female of approximately M.D.'s age, and would sexually molest her while watching the child pornography on his computer. Defendant's use of the computer in these manners it is consistent with Special Agent Bliss's experience that individuals engaged in crimes of child pornography and child sexual exploitation view such materials for their own sexual arousal or gratification and to lower the inhibitions of children they are attempting to seduce, to arouse selected child partners, or demonstrate the desired sexual acts. This behavior has also been widely recognized by courts considering these crimes and is generally referred to as "grooming." *United States v. Arnold E. Fox*, No. 14-5391, 2015 WL 364012, at *5-*6 (6th Cir. Jan. 28, 2015). The Sixth Circuit has recognized that "'grooming' encompasses a wide swath of behavior," including "deliberate actions taken by a defendant to expose a child to sexual activity" with the "ultimate goal" being the "formation of an emotional connection with the child and the reduction of the child's

---

[5] While Defendant states that there must be a nexus between the alleged criminal activity in 2001 and the search in 2007, this statement appears to ignore that the Affidavit demonstrates that the sexual abuse of M.D. occurred not only in 2001, but on numerous occasions from 2001 until 2006. It is the nexus between the 2007 address and the *ongoing* alleged criminal conduct *from 2001 until 2006* that is at issue in this Court's review of the probable cause determination.

inhibitions in order to prepare the child for sexual activity." *Id.* (internal alterations omitted).

Defendant continued this pattern of behavior, which involved the use of his computer to display and view child pornography with M.D., for three months. He then began demanding that M.D. engage in sexual intercourse and other sexually explicit conduct as well as continue to watch child pornography on his computer. Defendant also took M.D. to South Carolina and sexually abused her throughout the trip, which included taking photographs of her with his digital camera in different sexual positions while she was asleep under the influence of a sleeping pill he provided her. M.D. advised that Defendant always used a digital camera to take the photographs and download them to his computer. Special Agent Bliss testified that the use of digital cameras to easily upload images to computers is a known method of operation for child pornographers to be able to store and distribute the content in an easy, quick, relatively secure, and relatively anonymous manner that is difficult for law enforcement to track.

After the sexual abuse in Memphis, Tennessee and in South Carolina, M.D. and her mother briefly moved without Defendant to Melbourne, Florida. However, by approximately June, 2005, Defendant was again residing with them at this address and engaging in sexually explicit conduct with M.D. When he arrived at the Melbourne residence, Defendant was still in possession of his computer. Later that same month, he moved out of their residence and took his computer with him. He moved back into the residence in November, 2005, and was still in possession of his computer equipment. In February, 2006, M.D., her mother, and Defendant moved to Satellite Beach, Florida, where Defendant prepared the same computer in a back room at the house. M.D. found still photographs of women in different sexual positions, including her mother and Defendant, on this computer. At this residence, Defendant committed sexual battery upon M.D. approximately 60 more

times. In April, 2006, Michelle Dobbs told Defendant to leave the residence, and the first items he removed were two computer hard drive towers that contained the pornographic images. Michelle Dobbs verified that these were the same hard drive towers that Defendant maintained in Tennessee while they cohabitated there. Michelle Dobbs also verified that Defendant maintained and used the same electronic mail address that he used while living in Tennessee and that she had been able to contact Defendant at his instant message address as recently as eight days before the application for the Search Warrant was made.

On September 24, 2007, Defendant was arrested and confessed to engaging in sexually explicit conduct with M.D. while she was a minor in Tennessee, South Carolina, and Florida. On that same day—one day before the application for the search warrant was made—Thai verified that Defendant possessed two computers at his apartment, that one was a laptop, and that the other an older tower style computer that he had possessed for a long time, including when he lived with Michelle Dobbs in Satellite Beach. Thai stated that Defendant only cared about taking his computer when he moved out of the residence with Dobbs, which Special Agent Bliss found to be consistent with M.D.'s report that the computer was the only item Defendant took from the residence when he left.

Special Agent Bliss further testified from his training, knowledge, and experience that child pornographers often collect and store images on their computers for either their own viewing or for distribution to others. He stated that child pornographers typically retain this material for many years, keeping their collections in a digital or electronic format in a private and secure place, often at their residence. He further advised that collectors of child pornography highly value the ability to keep their collection close by to enable them to view it as desired.

15

Based upon this evidence in the Affidavit, this Court must consider whether the issuing magistrate had a substantial basis to believe that there was a nexus between the evidence sought of the sexual abuse of M.D. from 2001 until 2006 and the Orlando, Florida address to be searched. The Affidavit makes clear that, despite Defendant's various places of residence, he maintained possession of the same computer, same electronic mail address, and same instant message address from the time the alleged sexual abuse of M.D. began in 2001 until mere days before the application for the Search Warrant. The Affidavit alleges that the Defendant used the computer in many of the ways that trained and experienced law enforcement officers expect from individuals engaged in child pornography—namely, to groom M.D. into engaging in the sexual activity through showing her child pornography on the computer, to upload digital images of child pornography of M.D. he produced via digital camera to the computer, and to store images of child pornography. His use of the computer was not an isolated occurrence—the Affidavit reflects that, wherever Defendant would go, his computer would go with him. Further, the Affidavit reflects that the computer was highly important to him, as it was the "only item" Defendant cared about moving from Michelle Dobbs' residence. This was also consistent with the training and experience of Special Agent Bliss that individuals engaging in child pornography seek to keep their computer nearby to keep their collection of materials accessible at will.

Based upon the extensive information set forth in the Affidavit, culminating with Michelle Dobbs verification that the computers removed from the Satellite Beach, Florida residence were the "same hard drive towers that [Defendant] maintained in Tennessee while [they] cohabitated at the same residence" and Thai's verification that the tower style computer that Defendant brought when he moved in with her and later took to the Waterford Point Apartments address was the same was

"in [Defendant's possession when [Defendant] lived with Michelle Dobbs in Satellite Beach, Florida," it is recommended that the issuing magistrate had a substantial basis to conclude that there was a nexus between the evidence of child pornography and sexual battery occurring from 2001 until 2006 and the residence maintained by Defendant at the Waterford Point Apartments in Orlando, Florida in 2007.

### C. *Staleness of Information Contained in Affidavit*

Finally, the Court must consider whether the information contained in the Affidavit must be deemed to be stale, as stale information should not be considered in the probable cause determination. The first consideration as to whether information is stale is the character of the crime. The Sixth Circuit has concluded that, "[a]lthough a warrant application must allege facts so closely related to the time of the issue of the warrant as to justify a finding of probable cause, . . . the same time limitations that have been applied to more fleeting crimes do not control the staleness inquiry for child pornography." *United States v. Lewis*, 605 F.3d 395, 402 (6th Cir. 2010) (internal citations, alterations, and quotations omitted). The *Lewis* court also stated that the Sixth Circuit has previously held in the context of a child pornography case that "images typically persist in some form on a computer hard drive even after the images have been deleted and . . . can often be recovered by forensic examiners." *Id*. (citing *United States v. Terry*, 522 F.3d 645, 650 n.2 (6th Cir. 2008). The Sixth Circuit further noted that its "relaxed approach toward temporal constraints in child pornography cases also comports with the practice of other circuits." *Lewis*, 605 F.3d at 402 (citing *United States v. Lacy*, 119 F.3d 742, 746 (9th Cir. 1997)) (internal citations omitted). Thus, the Court recommends that the nature of the alleged crimes weighs against a finding of staleness.

The second consideration as to whether information is stale is based upon the alleged

criminal himself and whether his alleged criminal behavior can be defined as "nomadic" or "entrenched." *See Frechette*, 583 F.3d at 378. The Affidavit alleges that Defendant persistently engaged in the viewing and production of child pornography and repeatedly engaged in sexually explicit conduct with M.D. The alleged conduct occurred over a six-year period at four locations in three states. The Affidavit further states that, before the application for the Search Warrant was made, Defendant was arrested and confessed to engaging in sexually explicit conduct with M.D. while she was a minor in Tenneseee, South Carolina, and Florida. While certain portions of the Affidavit do not explicitly address the frequency of the alleged criminal conduct, the portions that do so allege that Defendant engaged in extremely frequent sexual abuse of M.D. The allegations regarding the road trip to South Carolina alone show repeated and constant sexual abuse on that date or days. On that one occasion, Defendant was so insistent that M.D. engage in sexually explicit conduct that he ignored her pleas of intense pain, drugged her with a sleeping pill, and took sexually explicit photographs of her while she was asleep under the influence of the sleeping pill. While the South Carolina trip appears in and of itself to have been relatively brief, the Affidavit further reflects that during one period that lasted between one to three months—from February, 2006 until April, 2006—Defendant engaged in sexually explicit conduct with M.D. approximately sixty times. Thus, the Court recommends that these allegations overwhelmingly support a finding that the alleged criminal acts were entrenched and that the alleged acts of the criminal weigh against a finding of staleness.

The third consideration as to whether information is stale is the item sought to be seized. In this case, the Search Warrant sought evidence of child pornography as set forth in detail therein, including but not limited to, "[i]mages of child pornography and files containing images of child

pornography in any form wherever it may be stored or found, including . . . [a]ny computer, computer system and related peripherals," "movies, photographs, and other evidence of the felony sexual battery incidents between Mark Baechtle and the victim [M.D.]," and "motion pictures, films, videos, and other records of visual depictions of children engaged in sexually explicit conduct." As the *Lewis* court noted in addressing the unique context of child pornography as it pertains to the question of staleness, computer evidence of child pornography may often be retrieved by forensic examination even if it had been deleted. 605 F.3d at 402 (citing *Terry*, 522 F.3d at 650 n.2). This ability to retrieve evidence of past crimes combined with the Affidavit's allegations that Defendant had kept the same computer from 2001 until the day before the search warrant application in 2007 weighs heavily against a finding of staleness, as does his allegedly intense desire to keep the computer with him wherever he resided.

The final consideration is the place to be searched—in this case, the Orlando, Florida apartment that Thai confirmed was Defendant's current address and the place where he possessed the same computer that he had possessed when residing with Michelle Dobbs and M.D. Michelle Dobbs and Thai's statements that tie his possession of that computer to that address also weigh very heavily against a finding of staleness.

Thus, based upon the Sixth Circuit's guidance on the unique and non-fleeting nature of the crime of child pornography, the overwhelming allegations as to the entrenched nature of the alleged criminal activity in this case, Defendant's consistent possession of the same computer on which he was known to have stored child pornography, including images he created of M.D., and Defendant's alleged possession of the computer at the address where the Search Warrant permitted the search, the Court recommends that the evidence contained in the Affidavit was not stale.

Further, as the Court finds that the issuing magistrate judge had a substantial basis for finding that the Affidavit established a nexus between the place to be searched and the evidence sought and that the Affidavit did not contain stale information that should not have been considered in the probable cause determination, the Court recommends that there is no basis to disturb the issuing magistrate's determination that probable cause existed for the issuance of the Search Warrant. Accordingly, it is recommended that Defendant's Motion to Suppress Evidence be DENIED.[6]

## IV. Conclusion

For the reasons set forth herein, it is recommended that Defendant's Motion to Suppress Evidence be DENIED.

**DATED** this 10th day of February, 2015.

s/ Charmiane G. Claxton
CHARMIANE G. CLAXTON
UNITED STATES MAGISTRATE JUDGE

**ANY OBJECTIONS OR EXCEPTIONS TO THIS REPORT MUST BE FILED WITHIN FOURTEEN (14) DAYS AFTER BEING SERVED WITH A COPY OF THE REPORT. 28 U.S.C. § 636(b)(1)(C). FAILURE TO FILE THEM WITHIN FOURTEEN (14) DAYS MAY CONSTITUTE A WAIVER OF OBJECTIONS, EXCEPTIONS, AND ANY FURTHER APPEAL.**

---

[6] Defendant's Motion to Suppress Evidence further requests that any evidence obtained in the September 25, 2007 search of Defendant's residence, including the VHS video, be suppressed pursuant to *Wong Sun v. United States*, 371 U.S. 471, 484 (1963). As the Court recommends that there has been no Fourth Amendment violation, the Court further recommends that there is no basis to suppress any evidence pursuant to the fruit-of-the-poisonous-tree doctrine in *Wong Sun*.